UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FREDERICK L. FELDKAMP; JUDITH L.
FELDKAMP,

                Plaintiffs,

vs.                                        Case No.  2:09-cv-253-FtM-29SPC

LONG BAY PARTNERS, LLC a Florida
limited liability company,

                Defendant.
_____

## OPINION AND ORDER

This case involves a dispute over a refundable deposit on a golf membership at a country club in the amount of $62,000 (or $92,000).  Plaintiffs, represented by counsel, seek damages of up to $473.3 million.  The matter now comes before the Court on cross-motions for summary judgment.

On June 1, 2010, both parties filed motions for summary judgment as to the Second Amended Complaint (Docs. ## 78, 79).[1]  On June 18, 2010, the parties filed responses to the respective motions (Docs. ## 85, 86).  On September 14, 2010, this Court entered an Opinion and Order dismissing Count IV of the Second Amended Complaint for failure to state a claim (Doc. #99), but

_____

[1] Plaintiffs' motion for summary judgment addressed Counts I-III of the Second Amended Complaint, whereas Defendant's motion addressed Counts I-IV.

granted plaintiffs leave to amend the allegations relating to Count IV only.

On October 22, 2010, plaintiffs filed a Third Amended Complaint (Doc. #105) and a motion for summary judgment as to the amended Count IV (Doc. #106). In response, on November 18, 2010, defendant filed a motion to dismiss or in the alternative motion for summary judgment as to Count IV (Doc. #113). On December 9, 2010, plaintiffs filed a response (Doc. #120) to defendant's motion, and on December 17, 2010, defendant filed its reply (Doc. #122). Because the allegations of Counts I, II and III are identical to those in the Second Amended Complaint, the Court has construed the prior motions for summary judgment (Docs. ##78, 79) as applying to the Third Amended Complaint.

## I.

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys R Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010)(citation omitted). A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of identifying those

portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004).  To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party.  Scott v. Harris, 550 U.S. 372, 378 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).  However, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods Inc. v. Am.'s Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999), quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983) (finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should

be drawn from these facts"). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007). However, "the mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003).

## II.

The following facts are undisputed for summary judgment purposes:

Defendant Long Bay Partners, LLC (defendant or LBP) was in the business of developing (but not constructing) residential communities and golf club facilities. On or about April 19, 2005, plaintiffs Frederick L. Feldkamp and Judith L. Feldkamp (plaintiffs or the Feldkamps) entered into a contract with Taylor Woodrow Communities at Shadow Wood Preserve, LLC (Taylor Woodrow) to purchase a lot and a house to be built at 18170 Creekside View Drive, Bonita Springs, Florida (the Property). The Property is located in a development known as Shadow Wood Preserve. Taylor Woodrow was not owned by or affiliated with LBP. At the time, LBP owned club facilities, some of which were operated by or on behalf of LBP under the name of Shadow Wood Country Club (SWCC or the

Club) in the Shadow Wood Preserve.  As part of the real estate transaction with Taylor Woodrow, the Feldkamps received a Certificate issued by Brooks Realty on SWCC letterhead redeemable within three months for a $30,000 credit towards a $92,000 resident Golf Membership at SWCC.

On or about June 20, 2005, the Feldkamps presented and LBP accepted the Certificate as a $30,000 credit toward their fully refundable Golf Membership at SWCC.  Effective July 14, 2005, the Feldkamps submitted, and LBP accepted, an Application for Resident Golf Membership.  (Doc. #105-2.)  The Application provided in relevant part:

- SWCC is a private club owned and operated by LBP. Membership privileges are subject to the terms and conditions of the Club Membership Plan and Rules and Regulations, a copy of which the Feldkamps acknowledged receipt.  (Id. at p. 3, ¶ 2.)

- A member could resign from the Club by giving advance written notice to the Club "in accordance with the terms and conditions as the Club may require from time to time."  (Id. at p. 4, ¶ 5.)

- Upon resignation, "One hundred percent (100%) of the membership deposit paid by a member will be refunded, without interest, by the Club to the member within 30 days after providing written notice of resignation to the Club, without having to be placed on any waiting list to receive a refund."  Otherwise, the membership deposit paid by the member would be refunded 30 years after the date membership is issued by the Club. (Id. at p. 3, ¶ 4.)

- "I hereby acknowledge receipt of the Shadow Wood Country Club Membership Plan and the Rules and Regulations and agree to be bound by the terms and conditions thereof as the same may be amended from

> time to time by the Club or LBP and irrevocably
> agree to fully substitute the membership privileges
> acquired pursuant to the Club Rules and Regulations
> for any present or prior rights in or to use of the
> Club Facilities. . . ."  (<u>Id.</u> at p. 4, ¶ 8.)

The Application was approved and accepted by LBP on July 14, 2005.

LBP collected the remaining $62,000 deposit from the Feldkamps in

the form of a $5,000 personal check and $57,000 in proceeds from

an interest-free loan to the Feldkamps from SunTrust Bank (the

interest was paid by LBP) arranged by LBP.

On or about July 19, 2005, LBP mailed the Feldkamps a

membership packet consisting of the Club Membership Plan, Rules and

Regulations and three proposed addenda.  The Membership Plan

provided in pertinent part:

- "Refundable Membership Deposit.  If a Resident Golf
  Membership is purchased within 90 days of contract
  date for a new lot or home, you will receive one
  hundred percent (100%) of the membership deposit
  within 30 days after resignation, as provided for
  in this Membership Plan. . . .  If a Resident Golf
  Membership is acquired after the applicable 90-day
  period, one hundred percent (100%) of the
  membership deposit will be refunded after the Club
  has reissued the resigned membership to three new
  members pursuant to the procedure described in this
  Membership Plan."  (Doc. #105-4, p. ii.)

- "Each person who desires to acquire a membership
  will be required to pay a refundable membership
  deposit and a non-refundable initiation fee
  determined by the Club from time to time.
  Membership deposits are refundable only in
  accordance with this Membership Plan, the Rules and
  Regulations of the Club and the Application for
  Membership.  The required membership deposit and
  initiation fee must be paid in full upon
  application to the Club."  (<u>Id.</u> at p. 6.)

- New lot/home buyers who choose to purchase the Golf Membership within 90 days of the contract on their home or lot "will receive a refund of 100% of their membership deposit within 30 days of written notice of resignation to the Club." For memberships purchased after the 90-day period, the member would be placed on a "resignation wait list" in chronological order of resignation; the first person on the wait list would receive their refund only after three other Golf Memberships have been sold by the Club. (Id. at pp. 6-7.)

- Membership could be transferred only back to the Club. (Id. at p. 8.)

- "Membership in the Club permits the member to use the Club Facilities in accordance with the Membership Plan and the Rules and Regulations, as they may be amended from time to time." (Id. at p. 10.)

- "A member only acquires a revocable license to use the Club Facilities. The Club reserves the right, in its sole discretion, to terminate or modify this Membership Plan and Rules and Regulations, . . . and to make any other changes in the terms and conditions of membership or in the Club Facilities available for use by members." (Id. at p. 10.)

- "In the event of termination of the Membership Plan, termination of a person's category of membership or the discontinuance of operation of all or substantially all of the Club Facilities, the Club will refund the membership deposit, as determined upon the purchase of the membership to the affected members." (Id. at p. 10.)

- "THE RIGHTS OF MEMBERS TO USE THE CLUB FACILITIES ARE GOVERNED ONLY BY THIS MEMBERSHIP PLAN. If approved for membership in the Club, the member agrees to be bound by the terms and conditions of this Membership Plan and the Rules and Regulations of the Club, as amended from time to time, and irrevocably agrees to fully substitute the membership privileges acquired pursuant to this Membership Plan and Rules and Regulations for any present or prior rights in or to use of the Club Facilities." (Id. at p. 11.)

The Rules and Regulations (Doc. #105-4) provided in pertinent part:

- "These Rules and Regulations are established by the Club to protect the Club Facilities and to promote the health, safety, welfare, and enjoment of the members, their families and guests and all other persons using the Club Facilities.  The Club may amend these Rules and Regulations from time to time." (Doc. #105-4, p. 1.)

- "A member may resign their membership in the Club by delivering written notice of resignation to the Club's Administrative Office.  A membership shall be deemed to have been resigned as of the date the Club receives written notice of the member's resignation." (Id. at p. 5.)

On July 25, 2005, plaintiffs signed an Addendum to Application for Membership (Doc. #105-6, p. 5), which provided that plaintiffs understood "that the membership deposit [they] paid to join the Club in the category above will be refunded according to the Membership Plan, without interest upon the earlier of the following: (a) thirty years after the date the membership is issued by the Club, or (b) within thirty days after written notice of resignation of the membership is delivered to the Club." Plaintiffs requested the membership, including the right to receive the refund, to be owned by Judith L. Feldkamp and Frederick L. Feldkamp.

LBP also requested plaintiffs to sign an Addendum to Application for Credit Toward Membership, which included the following provision:

"I understand that because the $30,000 credit toward
membership deposit was paid for me by others, the $30,000
credit amount is not refundable to me upon resignation,
prior to conversion.  The additional amount I pay for the
Membership (the difference between the $30,000 credit and
the Membership Deposit) will be refundable as provided in
my Application for Membership and the Membership Plan.
I further understand that I am not ever entitled to a
refund of the non-refundable Initiation Fee."

Plaintiffs refused to sign the form.  (Doc. 105, ¶ 23; Doc. 110, ¶
23).  On August 1, 2005, plaintiffs modified the form by making
several technical changes, crossing out the above provision in its
entirety, and signing it.  (Doc. #105-6, p. 4.)

LBP told the Feldkamps that it would deny their membership in
SWCC if they did not sign the Addendum for Credit.  The Feldkamps
continued to refuse to sign this addendum.  SWCC nonetheless
accepted the Feldkamps as members and accepted their dues from
July, 2005 through March 31, 2009.

On or about November 13, 2006, plaintiffs completed the
purchase of the Property.

On November 7, 2008, LBP "suspended" the membership deposit
refund policy.  (Doc. #80, ¶ 24.)  In a letter dated March 18,
2009, the Feldkamps provided written notice to LBP of their
resignation from SWCC, effective in thirty days, and requested a
refund of the $92,000 membership deposit, less any offset.  On
April 1, 2009, LBP's president sent the Feldkamps a letter by
electronic mail stating that LBP would not issue refunds until it
had the approval of its bank as part of a restructured agreement.
LBP has refused to refund the Feldkamps' deposit, asserting it had

the authority to unilaterally suspend the refund policy. (Doc. #110, ¶¶ 30, 34.) Plaintiffs filed this civil action on April 27, 2009. (Doc. #1.) Approximately, four months later, in September 2009, LBP amended the membership deposit refund policy to a "three-in, one-out" policy, i.e., for every three new members who join a particular category of membership, one member may resign and receive a refund. (Doc. #80-5.)

### III.

Because jurisdiction in this case is premised on diversity of citizenship, the Court must apply the choice of law rules of the forum state to determine which law applies to the substantive claims. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941); <u>Mid-Continent Cas. Co. v. Am. Pride Bldg. Co. LLC</u>, 601 F.3d 1143, 1148 (11th Cir. 2010). "Under Florida law, a court makes a separate choice of law determination with respect to each particular issue under consideration." <u>Trumpet Vine Invs. N.V. v. Union Capital Partners I, Inc.</u>, 92 F.3d 1110, 1115 (11th Cir. 1996). The parties agree, as does the Court, that the Court must apply the substantive law of Florida, the forum state, to all issues not governed by federal law. (Doc. #136, § XI, ¶2.)

### A.   Counts I and II: Declaratory Judgment and Breach of Contract

In Count I of the Third Amended Complaint, the Feldkamps seek a declaratory judgment that LBP did not have the contractual right to unilaterally amend the refund policy. In Count II the Feldkamps

allege that LBP breached the contract by refusing to refund the $92,000 deposit within thirty days of their written request.  "The elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." AVVA-BC, LLC v. Amiel, 25 So. 3d 7, 12 n.3 (Fla. 3d DCA 2009)(citations omitted).   These related counts require the Court to determine whether the contract is unambiguous, and if so, whether the undisputed material facts establish a breach of the contract and resulting damages.

**(1) Existence of a Contract:**

Neither party disputes the existence of a contract between the Feldkamps and LBP.  The relationship between a social club and its members is one of contract, which must be judged in accordance with its terms. Hamlet Country Club, Inc. v. Allen, 622 So. 2d 1081, 1082 (Fla. 4th DCA 1993)(citing Reynolds v. Surf Club, 473 So. 2d 1327 (Fla. 3d DCA 1985)); Susi v. St. Andrews Country Club, Inc., 727 So. 2d 1058 (Fla. 4th DCA 1999)(citing Garvey v. Seattle Tennis Club, 60 808 P.2d 1155, 1157 (Wash. Ct. App. 1991)).  "Where a written contract refers to and sufficiently describes another document, that other document or so much of it as is referred to, may be regarded as part of the contract and therefore is properly considered in its interpretation." Eli Lilly & Co. v. Air Express Int'l USA, Inc., 615 F.3d 1305, 1316 (11th Cir. 2010)(citing Hurwitz v. C.G.J. Corp., 168 So. 2d 84, 86 (Fla. 3d DCA 1964)).

The contract in this case consists of the Application For Resident Golf Membership, the Addendum to Application for Resident Golf Membership, the Shadow Wood Country Club Certificate of Membership from Taylor Woodrow, the Taylor Woodrow Addendum to Application for Credit Toward Membership, the Addendum to Application for Membership, and the Shadow Wood Country Club Purchaser's Acknowledgment, as well as the incorporated Membership Plan and the Rules and Regulations.

**(2) Breach of the Contract:**

Whether the contract was breached is disputed by the parties. This issue largely depends on how the contract is interpreted, since it is undisputed that LBP has not refunded any amount of the deposit to the Feldkamps.

The Florida principles concerning contract interpretation are well settled. "Where the language of a contract is unambiguous, the legal effect of that language is a question of law." Orkin Exterminating Co., Inc. v. F.T .C., 849 F.2d 1354, 1360 (11th Cir. 1988); see also Smith v. Shelton, 970 So. 2d 450, 451 (Fla. 4th DCA 2007). The question of "whether a contractual ambiguity exists is also a question of law which the court may resolve summarily." Int'l Bhd. of Boilermakers v. Local Lodge D111, 858 F.2d 1559, 1561 (11th Cir. 1988); see also Abis v. Tudin, D.V.M., P.A., 18 So. 3d 666, 668 (Fla. 2d DCA 2009). Where a word or phrase in a contract is subject to more than one reasonable meaning, it is ambiguous.

Orkin, 849 F.2d at 1360; Detroit Diesel Corp. v. Atlantic Mut. Ins.
Co., 18 So. 3d 618, 620 (Fla. 4th DCA 2009); Friedman v. Va. Metal
Prods. Corp., 56 So. 2d 515, 517 (Fla. 1952).  If the agreement is
ambiguous, its interpretation involves questions of fact,
precluding summary disposition.   Smith v. Shelton, 970 So. 2d at
450.  The mere assertion that a contractual ambiguity exists, or a
dispute over contractual terms, does not create such an ambiguity.
Orkin, 849 F.2d at 1360 (citing Vreeland v. Fed. Power Comm'n, 528
F.2d 1343, 1351 (5th Cir. 1976)).

Under Florida law, "[i]t is well settled that the actual
language used in the contract is the best evidence of the intent of
the parties and, thus, the plain meaning of that language
controls."  Rose v. M/V "Gulf Stream Falcon", 186 F.3d 1345, 1350
(11th Cir. 1999) (citing Green v. Life & Health of Am., 704 So. 2d
1386, 1391 (Fla. 1998)); see also Palm Beach Mgmt., Inc. v.
Carroll, 7 So. 3d 1144, 1145 (Fla. 4th DCA 2009).  Additionally,
under Florida law the Court does not read clauses in a contract in
isolation, but looks to the contract as a whole. See Jones v.
Warmack, 967 So. 2d 400, 402 (Fla. 1st DCA 2007).  "In interpreting
a contract under Florida law, we give effect to the plain language
of contracts when that language is clear and unambiguous.  We must
read the contract to give meaning to each and every word it
contains, and we avoid treating a word as redundant or mere
surplusage if any meaning, reasonable and consistent with other
parts, can be given to it."  Equity Lifestyle Props., Inc. v. Fla.

Mowing & Landscape Serv., Inc., 556 F.3d 1232, 1242 (11th Cir. 2009)(internal quotation marks, citations and footnote omitted.) "When a contract contains apparently conflicting clauses, we must interpret it in a manner that would reconcile the conflicting clauses, if possible." Lloyds Underwriters v. Netterstrom, 17 So. 3d 732, 735 (Fla. 1st DCA 2009). "[A] court should strive to give effect to the intent of the parties in accord with reason and probability as gleaned from the whole agreement and its purpose." Arthur Rutenberg Corp. v. Pasin, 506 So. 2d 33, 34 (Fla. DCA 1987). "[I]f one construction would lead to an absurd conclusion, such interpretation must be abandoned and that adopted which will be more consistent with reason and probability." Am. Med. Int'l, Inc. v. Scheller, 462 So. 2d 1, 7 (Fla. 4th DCA 1984).

The Court has reviewed the contract and finds no ambiguity with respect to the membership deposit refund. Paragraph 4 of the Application provided, under the heading "Refund of Membership Deposit":

> One hundred percent (100%) of the membership deposit paid by a member will be refunded, without interest by the Club to the member within 30 days after providing written notice of resignation to the Club, without having to be placed on a waiting list to receive a refund.

(Doc. #105-2, p. 3 ¶4.) This paragraph did not include any limitations or qualifications as to the right to a refund, other than the procedural requirement of a written notice of resignation. It is clear from the language that LBP unambiguously agreed to refund the Feldkamps' full membership deposit within thirty days of

-14-

written notice of their resignation from the Club.  The following paragraph in the Application relates to the manner of resignation, and stated that a member could resign by giving advance written notice to the Club "in accordance with the terms and conditions as the Club may require from time to time."  (Doc. #105-2, p. 3, ¶ 5.)  This paragraph, plainly read, implies that the Club could amend the resignation notice procedure, not the refund obligation itself.

This plain meaning is confirmed in the Addendum to Application, which provided that plaintiffs understood

> that the membership deposit paid to join the Club in the category above will be refunded according to the Membership Plan, without interest upon the earlier of the following: (a) thirty years after the date the membership is issued by the Club, or (b) within thirty days after written notice of resignation of the membership is delivered to the Club.

(Doc. #105-6, p. 5.)  The procedure for the refund is pursuant to the Membership Plan; the right to the refund is within thirty days of written notice of resignation or thirty years after membership.

LBP contends, however, that the contract allowed it to unilaterally suspend and later amend its refund obligation.  LBP points to the following provision in the Application for Membership:

> I [the Feldkamps] hereby acknowledge receipt of the Shadow Wood Country Club Membership Plan and the Rules and Regulations and agree to be bound by the terms and conditions thereof *as the same may be amended from time to time by the Club or LBP* and irrevocably agree to fully substitute the membership privileges acquired pursuant to

the Club Rules and Regulations for any present or prior
rights in or to use of the Club Facilities.

(Doc. #105-2, p. 4, ¶8)(emphasis added).  Because the Feldkamps
agreed to be bound by the Membership Plan and the Rules and
Regulations, which "may be amended from time to time by the Club or
LBP", LBP argues that any promises made in the Application were
also amendable.  Accordingly, LBP asserts plaintiffs had no vested
contractual rights.  (Doc. #85, pp. 8-10.)  Looking to the contract
as a whole, the Court finds LBP's interpretation is unreasonable.

First, the Membership Plan confirms the contractual right to
a 100% refund in circumstances such as this case.  (Doc. #105-4, p.
ii; p. 6.)  Second, the Membership Plan confirms the procedure for
obtaining such a refund was "only in accordance with this
Membership Plan, the Rules and Regulations of the Club and the
Application for Membership" (Doc. #105-4, p. 6), and that the
Membership Plan and the Rules and Regulations [but not the
Application] may be "amended from time to time" (Id. at p. 11).
Similarly, the Rules and Regulations confirms and details the
procedure by which a member may resign (written notice to the
Club's Administrative Office; deemed effective the date received by
the Club) (Id. at p. 5) and confirms that the Rules and Regulations
may be amended "from time to time."  (Id. at p. 11.)

Finally, the final portion of the sentence ("irrevocably agree
to fully substitute the membership privileges acquired pursuant to
the Club Rules and Regulations for any present or prior rights in

-16-

or to use of the Club Facilities") confirms that the potential amendment affects membership privileges ("rights in or to use of the Club Facilities"), not the substantive right to a refund.  The only reasonable interpretation of the provision is that LBP had the unilateral right to make changes which would affect the prior rights in or use of the Club Facilities (e.g., changes related to membership dues, Club operations and services, guest and family privileges, sale of the Club, etc.).[2]  Thus, the refund obligation remained a vested contractual right, not subject to amendment by the Club.

The Court is not persuaded by defendant's reliance on either Susi or Hamlet to support its position.  Susi involved a club's interpretation of an amendment to its bylaws which was authorized by a vote of the membership, not an issue as to whether the bylaws could be amended.  In Hamlet, the right of redemption emanated solely from the bylaws, which were clearly subject to amendment,

_____

[2]The right of amendment is referred to throughout the governing documents in connection with "use" of the club facilities, "membership privileges" and the "rules and regulations." (Doc. #105-4.)  Further, the weight of the authority supports the courts reading that a general reservation of the power to amend is more naturally applied to the class of bylaws that are mere regulations governing the conduct of the internal affairs of the organization. See generally, 8 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 4177.20 (rev. ed. 2010); Black v. Glass, 438 So. 2d 1359, 1371 (Ala. 1983); see also Ayers v. Grand Lodge A.O.U.W., 80 N.E. 1020, 1021 (N.Y. 1907)("An amendment of by-laws which form part of a contract is an amendment of the contract itself and when such a power is reserved in general terms, the parties do not mean, as the courts hold, that the contract is subject to change in any essential particular at the election of the one in whose favor the reservation is made.").

appears not to have been used to induce application to the club, and did not involve an unqualified promise of a refund similar to the one in the instant case.

The application of the proper legal principles in this case more closely tracks the holding in First Florida Bank v. Fin. Transactions Sys., Inc., 522 So. 2d 891 (Fla. 2d DCA 1988). In First Florida, a bank applied for and was accepted as a member of FTSI, a nonprofit organization formed for the purpose of processing credit card transactions for its member banks. Id. at 891. In connection with its application for membership, the bank signed a statement agreeing to abide by all existing provisions of the charter, bylaws, and operating rules of FTSI and any future amendments. Id. (emphasis added.) At the time that the bank joined FTSI, the charter and bylaws allowed a member to resign, without penalty, upon thirty days written notice. Id. at 892. The bylaws were later amended to require one-year notice (without penalty), or alternatively, at least three-months written notice and payment of a $1,000 fee for each month less than twelve. Id. The bank later resigned and was assessed a $9,000 penalty in accordance with the amended bylaws. Citing Bhd.'s Relief & Comp. Fund v. Cagina (Cagina), 155 So. 2d 820 (Fla. 2d DCA 1975), the court held:

> It is firmly established that a corporation is prohibited from amending its bylaws so as to impair a member's contractual right. Although First Florida signed a statement, upon receiving membership in FTSI, to abide by

> all amendments in FTSI's charter, bylaws, and operating
> rules, FTSI cannot validly amend the parties' original
> agreement regarding voluntary termination in a manner
> which deprives First Florida of its vested contractual
> rights.

Id.  As Cagina further stated:

> [E]ven though an express reservation of the power of
> amendment has been made, the general consent that a
> member thereby gives to be bound by all present and
> future enactments of the association does not contemplate
> that it may be made a means of depriving him of those
> rights that became vested upon his admission to
> membership.

Cagina, 155 So. 2d at 824.  Here, based upon the language of the
parties' agreement, it is clear that the Feldkamps' right to a 100%
refund of their deposit became vested upon their admission to the
Club.  Defendant's general reservation of its right to amend cannot
impair that right.

Finally, defendant argues that its reservation of the right to
amend does not render the agreement illusory because that right was
not unfettered, but was limited by "reasonableness."  Defendant
further argues that the agreement does not fail for lack of
consideration because the promise of a refund within thirty days of
resignation was not the only consideration plaintiffs received in
exchange for their deposit; the Club provided access to its
facilities after it suspended the refund policy.  According to
defendant, that access supplied consideration for all of the terms
of the agreement.  (Doc. #79, p. 16.)

While parties may contemplate future modifications to their agreement and may contract for the right to make such amendments[3], defendant's interpretation of the agreement in this case would indeed render it illusory and unenforceable.   "Where one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound."  See Contractpoint Fla. Parks, LLC v. State of Florida, 958 So. 2d 1035, 1036 (Fla. 1st DCA 2007)(citing Miami Coca-Cola Bottling Co. v. Orange-Crush Co., 291 F. 102 (S.D. Fla. 1923), aff'd, 296 F. 693 (5th Cir. 1924)); See also Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc., 162 F.3d 1290, 1311 (11th Cir. 1998)(finding a contract illusory when "one of the promises appears on its face to be so insubstantial as to impose no obligation at all on the promisor-who says, in effect, 'I will if I want to.'").  If the Court were to read defendant's right to amend as broadly as suggested by defendant, defendant would have no

_____

[3]The reservation of a right to amend or modify an agreement does not necessarily render the agreement unenforceable. Typically, modifications of contracts must be supported by new consideration as well as the consent of both parties.  In re Estate of Johnson, 566 So. 2d 1345, 1347 (Fla. 4th DCA 1990); see also Newkirk Constr. Corp. v. Gulf Cnty., 366 So. 2d 813, 815 (Fla. 1st DCA 1979).  If, however, "...a contract provides for modification and the parties modify the contract in accord with the contract, no 'new and independent consideration [is] required to support the modification.' Rather, '[t]he contract as modified [is] supported by the original consideration.'"  Bolus v. Morrison Homes, Inc., No. 8:08-cv-1957, 2009 WL 4730601 at *2 (M.D. Fla. 2009)(quoting Harrison v. Tampa, 247 F. 569, 571-72 (S.D. Fla. 1918)); 11 Fla. Jur. 2d Contracts § 77 (2009).

obligations to plaintiffs whatsoever.   Contrary to defendant's assertions, plaintiffs were not even promised access to the Club facilities.   The Membership Plan itself states:

> The Club reserves the right, in its sole discretion, to...discontinue operation of any or all of the Club Facilities, to sell, lease or otherwise dispose of the Club Facilities in any manner whatsoever and to any person whomsoever...

(Doc. #105-4, p. 10.)   Significantly, the paragraph immediately following the above states:

> In the event of termination of the Membership Plan, termination of a person's category of membership or the discontinuance of operation of all or substantially all of the Club Facilities, *the Club will refund the membership deposit, as determined upon the purchase of the membership to the affected members*.

(Id. at p. 10)(emphasis added.)

If defendant could amend the refund policy and discontinue operation of the Club at its option, then defendant effectively made no promises to plaintiffs.   This would mean that with respect to its obligations under the agreement, defendant was saying "I will if I want to" – yet, plaintiffs were obligated to pay a deposit and continuing dues.   See Johnson, 162 F.3d at 1311.   Thus, based upon defendant's reading of the agreement, there would be no mutuality of obligation.   When possible, a contract must receive a construction which will render it valid and enforceable.   J.R.D Mgmt. Corp. v. Dulin, 883 So. 2d 314, 316-17 (Fla. 4th DCA 2004). Accordingly, the Court declines to adopt defendant's interpretation of the agreement.

The Court finds that the plain and unambiguous contract provisions mean that LBP could not unilaterally suspend or amend its contractual obligation to refund the Feldkamp's membership deposit upon compliance with the thirty-day written notice requirement.  The evidence is undisputed that LBP did unilaterally suspend and amend its contractual obligation to refund the Feldkamp's membership deposit, that the Feldkamps gave proper written notice of their resignation by a letter dated March 18, 2009 and received on March 20, 2009[4], and that LBP failed to refund the deposit within thirty days thereafter.

**(3)  Resulting Damages:**

Plaintiffs contend that they are entitled to recover the principal amount of $62,000 (which they paid in the form of a $5,000 personal check and $57,000 in proceeds from an interest-free loan), plus the $30,000 credit they received from the builder. (Doc. #136, § VIII, p. 15.)  Defendant responds that the parties' agreement calls for a refund of the amount "paid by a member" in satisfaction of their initiation deposit, and plaintiffs only "paid" $62,000.  The $30,000 credit, defendant argues, was not the result of any payment by the builder to the Club, but rather was a

---

[4]    Plaintiffs' letter presumes two days for mailing and requests a refund on or before April 20, 2009.  Because defendant neither disputes receipt of the letter nor its effective date, the Court will presume the Feldkamps' resignation letter was received by defendant on March 20, 2009.  (Doc. #105-7.)

discount agreed to by the Club and the builder to help stimulate sales. (Doc. #136, § IV, p. 6.)

The purpose of damages is to restore an injured party to the same position that he would have been in had the other party not breached the contract. Lindon v. Dalton Hotel Corp., 49 So. 3d 299, 305 (Fla. DCA 5th 2010).

> It is well-settled that the injured party in a breach of contract action is entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract. The injured party is entitled to recover all damages that are causally related to the breach so long as the damages were reasonably foreseeable at the time the parties entered into the contract. Damages are foreseeable if they are the proximate and usual consequence of the breaching party's act. It is not necessary that the parties have contemplated the exact injury which occurred as long as the actual consequences could have been reasonably expected to flow from the breach.

Capitol Envtl. Servs., Inc. v. Earth Tech, Inc., 25 So. 3d 593, 596 (Fla. 1st DCA 2009)(internal quotations and citations omitted). In restoring the injured party to the same position, he is not entitled to be placed, because of the breach, in a position better than that which he would have occupied had the contract been performed. Lindon, 49 So. 3d at 305 (citations and quotations omitted.) Instead, the injured party may only recover those damages that naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time that the contract was made. Id. at 306. It is not necessary that the parties have contemplated the exact injury that occurred as long as the actual

consequences could have reasonably been expected to flow from the breach.  Id.

The contract obligated the Feldkamps to "pay my membership deposit and non-refundable initiation fee in full with this application."  (Doc. #105-2, p. 2, ¶1.)  The contract also obligated LBP to refund "one hundred percent (100%) of the membership deposit paid by a member . . ." thirty days after resignation.  (Doc. #105-2, p. 3, ¶4.)  The Court finds the term "paid by a member" unambiguous and includes the $30,000 Certificate credit.  It is undisputed that the membership deposit amount was $92,000, and that this amount was paid by the Feldkamps and accepted by LBP in the following manner: A $5,000 check from the Feldkamps, proceeds of a $57,000 loan to the Feldkamps, and the $30,000 Certificate credit.  The credit Certificate constituted an amount "paid by a member" as much as the loan proceeds from the third-party bank constituted an amount paid by the member.  LBP accepted all three sources of funds as fulfilling the members' payment obligation.  The business arrangement between LBP and the builder is not a matter which impacts the Feldkamps' contract.  For better or worse, LBP agreed to accept the $30,000 certificate.

Additionally, LBP clearly interpreted the language of the contract in the same manner.  Otherwise, there would have been no need for the proposed addendum changing the contract to exclude the $30,000 from the refund amount.  Further, LBP at least acquiesced in this interpretation by accepting the signed addendum which

-24-

eliminated the proposed language and continuing to accept the Feldkamps' membership dues payments for almost four years.

Plaintiffs further request consequential damages, including the cost of improvements to and the loss of value to their home. Neither of these are consequential damages to the breach of the Club membership contract. The Club membership was a license to use the golf and club facilities, and was not transferrable to anyone other than back to the Club. Nothing about this dispute would have caused a need for improvements to the Feldkamps house or have caused the loss of value in the house. No purchaser would have the right to the Feldkamps' membership. Had the contract not been breached, the Feldkamps would have had their $92,000 returned, but nothing about the house would have changed. The Court can not award such damages since they cannot be said to "naturally flow" from the Club's breach of its club membership contract with plaintiffs. The Club breached its agreement with plaintiffs by failing to return their deposit related to their golf club membership. No reasonable jury could find that the failure to return the Club membership deposit caused these damages.

Summary judgment will be entered in favor of the Feldkamps in the amount of $92,000 plus prejudgment interest beginning April 27, 2009.[5]

---

[5] Prejudgment interest is calculated from the date of demand for a sum found due and owing. See Neimark v. Abramson, 403 So. 2d 1057, 1058 (Fla. 3d DCA 1981). Arguably, the date of demand in
(continued...)

**Count III: Unjust Enrichment**

Because the Court has granted summary judgment with respect to plaintiffs' breach of contract claim, plaintiffs' motion for summary judgment with respect to this count will be denied as moot.  Moynet v. Courtois, 8 So. 3d 377, 379 (Fla. 3d DCA 2009)(citing Diamond "S" Dev. Corp. v. Mercantile Bank, 989 So. 2d 696, 697 (Fla. 1st DCA 2008))("[W]here there is an express contract between the parties, claims arising out of that contractual relationship will not support a claim for unjust enrichment.")

**Count IV: Violation of Florida's Uniform Fraudulent Transfer Act**

In Count IV, plaintiffs allege that they were creditors of LBP and that LBP was a debtor, and that LBP made transfers which violated the Florid Uniform Fraudulent Transer Act (FUFTA).  To plead a cause of action for violation of FUFTA, plaintiffs must allege: (1) they were creditors who were defrauded, (2) that defendant intended to commit the fraud, and (3) that the fraud involved a conveyance of property that could have been applicable to the payment of the debt due.  Dillon v. Axxsys Int'l, Inc., 185 Fed. Appx. 823, 828-29 (11th Cir. 2006)(citing Nationsbank, N.A. v. Coastal Utils. Inc., 814 So. 2d 1227, 1229 (Fla. 4th DCA 2002)).

---

[5](...continued)
this case is April 20, 2009, but since plaintiffs have specifically requested prejudgment interest beginning on April 27, 2009, the Court will adopt that date.

The Court previously dismissed this Count because plaintiffs failed to sufficiently plead that LBP intended to defraud its creditors. (Doc. #99, p. 16.) The Court also identified additional pleading deficiencies, including plaintiffs' failure to identify the transfers they seek to set aside and their failure to sue the persons or entities who received the challenged transfers. (Doc. #99, p. 17.) Plaintiffs have amended Count IV by adding eighteen pages of additional allegations to the Complaint, yet they have failed to correct the pleading deficiencies identified by the Court in its previous order.

A complaint must contain a short and plain statement showing an entitlement to relief, and the statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)(citing FED. R. CIV. P. 8); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(citations omitted). "To survive dismissal, the complaint's allegations must plausibly suggest that the [plaintiff] has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff's complaint should be dismissed." James River Ins. Co. v. Ground Down Eng'q, Inc., 540 F.3d 1270, 1274 (11th Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)); see also Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010). The former rule--that "[a] complaint should be dismissed only if it appears beyond doubt that the plaintiffs can prove no

set of facts which would entitle them to relief," <u>La Grasta v. First Union Sec., Inc.</u>, 358 F.3d 840, 845 (11th Cir. 2004)--has been retired by <u>Twombly</u>. <u>James River Ins. Co.</u>, 540 F.3d at 1274.

First, the Court finds that the amended allegations fail to comply with Federal Rule of Civil Procedure 8.  Here, the allegations are verbose and confusing.  Rather than a simple statement of supporting facts, plaintiffs engage in extended argument in the Complaint.  With respect to the intent element, it appears that plaintiffs allege defendant committed both actual and constructive fraud,[6] but the Court cannot decipher facts which support these allegations.

Second, the Court can only avoid a transfer "to the extent necessary to satisfy the creditor's claim."  Fla. Stat. § 726.108(1)(a).  Plaintiffs have failed to identify a specific transfer they seek to set aside; rather, they allude generally to the alleged looting of the defendant in an amount exceeding $473 million (Doc. #105, ¶¶ 62, 73) and claim in the Pretrial Statement that they are entitled to these millions.

Finally, the Court cannot set aside a transfer when only one side of the transaction is before it as a party. Fed. R. Civ. P. 19(a)-(b); <u>Martinez v. Balbin</u>, 76 So. 2d 488, 490 (Fla. 1954)(holding that transferees who are beneficial owners of

---

[6] Violation of FUFTA can occur when a debtor actually intends to defraud its creditors (actual fraud) or when the debtor makes transfers without receiving reasonably equivalent value in exchange therefor (constructive fraud).  Fla. Stat. § 726.105(1)(a),(b).

property sought in action must be permitted to come into court and defend their interests);(Nastro v. D'Onofrio, 263 F. Supp. 2d 446, 450 (D. Conn. 2003)("In an action to set aside a fraudulent conveyance, the transferee of the assets at issue is a necessary party to the lawsuit because the action to set aside the allegedly fraudulent transfer necessarily impacts the transferee's interest in the property the transferee received."); Tanaka v. Nagata, 868 P.2d 450, 455 (Haw. 1994)("Fundamental principles of due process require that transferees who claim an interest in real property or its proceeds have a full and fair opportunity to contest claims of fraudulent transfer.").   Here, plaintiffs have alleged that defendant fraudulently transferred assets to "insiders" but have not named them as defendants in the Amended Complaint. (Doc. #105, ¶¶ 57-60.)

For the above reasons, Count IV will be dismissed.   Having allowed the opportunity for amendment, the Court will not allow an additional amendment this late in the proceedings.

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1.   Plaintiffs' Motion for Partial Summary Judgment with respect to Counts I and II (Doc. #78) is **GRANTED**.   Defendant's Motion for Summary Judgment with respect to these Counts (Doc. #79) is **DENIED**.

2.   Plaintiffs' Motion for Summary Judgment with respect to Count III (Doc. #78) is **DENIED** because Count III is **MOOT**; Defendants' Motion for Summary Judgment with respect to Count III (Doc. #79) is also **DENIED** for the same reason. Count III is **DISMISSED** with prejudice as moot.

3.   Defendant's Motion to Dismiss Count IV (Doc. #113) is **GRANTED** and Count IV is dismissed without prejudice. Plaintiffs' Motion for Summary Judgment (Doc. #106) with respect to Count IV is **DENIED AS MOOT**.

4.   The Final Pretrial Conference scheduled for Tuesday, February 22, 2011 at 9:00 a.m. is hereby **cancelled.**

5.   All other pending motions (Docs. ## 117, 125, 131, 137) are **DENIED** as moot.

6.   Finding that no issues remain to be tried, the Clerk shall enter Judgment as follows:

> Judgment is entered in favor of plaintiffs and against defendant as to Counts I and II, and plaintiffs are awarded the principal amount of $92,000, plus pre-judgment interest from April 27, 2009, to the date of judgment and post-judgment interest accruing thereafter at the current legal rate until paid. Count III is dismissed with prejudice as moot and Count IV is dismissed without prejudice. Let execution so issue.

7.   The Clerk shall close the file and terminate all remaining deadlines.

**DONE AND ORDERED** at Fort Myers, Florida, this   18th   day of February, 2011.

JOHN E. STEELE
**United States District Judge**

Copies: Counsel of record